UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

George E. Bailey,

Plaintiff,

v.

Augustine Medical, Inc.,
a Minnesota company,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-695 ADM/AJB

---

Clayton D. Halunen, Esq., Halunen & Associates, Minneapolis, MN, appeared for and on behalf of Plaintiff.

John J. McDonald, Jr., Esq., and Bradley J. Lindeman, Esq., Meagher & Geer, P.L.L.P., appeared on behalf of Defendant.

---

## I. INTRODUCTION

On November 13, 2002, the Motion for Summary Judgment [Docket No. 47] of Defendant Augustine Medical, Inc. ("Augustine"), was argued before the undersigned United States District Judge. Plaintiff George E. Bailey ("Bailey") alleges race discrimination and retaliation under Title VII of the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) and 2000e-3, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.03 Subd. 7. Second Am. Compl. Counts I and II.[1] Bailey also alleges a Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2612(a)(1)(D), violation based on retaliation. Id. Count III. For the reasons set forth below, the Summary Judgment Motion is granted.

---

[1] The Court's docket does not reflect the filing of the Second Amended Complaint. The legal significance of this will not be addressed at this time because the Second Amended Complaint was served on Augustine, and the parties have proceeded to brief and argue the additional claims and allegations raised in the Second Amended Complaint.

FEB 07 2003

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD FEB 07 2003
DEPUTY CLERK

## II. BACKGROUND[2]

Bailey began working for Augustine, a medical device manufacturer, as a temporary employee in the Accounts Payable Department in July, 1999. Approximately one month later a full-time position opened and Bailey e-mailed the Director of Human Resources, Carolyn Kassebaum ("Kassebaum") to indicate interest in the position. Despite a poor interview, Bailey was hired for the permanent position by Dan Mueller ("Mueller"), the controller of Augustine Medical. Kassebaum Dep. at 89 (Lindeman Aff. Ex. D). Bailey alleges Kassebaum told him that if he were interviewing "off the street" he would not have gotten the position, but because he had been a temporary employee he was given a "chance" despite being a "crappy interviewee." Bailey Dep. at 224-25.

In late 1999, Mueller had discussions with Bailey about the need to improve his accuracy as an accounts payable clerk. Mueller Statement at 6 (Lindeman Aff. Ex. C). Bailey submitted a tuition reimbursement request in accordance with Augustine's policy of reimbursing up to $5,250 per year tax-free for any undergraduate classes taken by someone without an undergraduate degree. Kassebaum Dep. at 52. In February, 2000, Bailey complained to Kassebaum that his request for tuition reimbursement benefits were wrongfully allocated to his year 2000 benefits when they should have been allocated to 1999. Bailey Dep. at 178-80. Bailey was told that the distribution of his benefits was consistent with policy and done in the same way as that of everyone else's benefits. Id. at 189-90; Halunen Aff. Ex. 1.

Around this time, Bailey was warned by Mueller that he was engaging in excessive

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

personal contact with Melinda Jendersee ("Jendersee"), a Human Resources Administrator, during working hours. Bailey Dep. at 200-01. Specifically, Bailey alleges that Mueller told Bailey to "limit [his] contact with [Jendersee] in the workplace because people don't like it." Id. Bailey asserts the "tone" Mueller used conveyed to him that his co-workers did not like him interacting with Jendersee because of his race.[3] Id. Bailey also alleges that John Thomas ("Thomas"), Augustine's president, told him he could not go to lunch with Jendersee. Id. at 262. Jendersee stated that she and Bailey were dating, however Bailey insists that they were "just friends." Id. at 191; Jendersee Dep. at 15 (Lindeman Aff. Ex. E). Bailey's interaction with Jendersee at work was considered to be disruptive to their work and others, and both were repeatedly told that the number of personal telephone calls and meetings between them was creating a problem. Mueller Statement at 28-29; Kassebaum Dep. at 56, 58-60; Jendersee Dep. at 43, 96-99. Kassebaum's notes from a February 2, 2000, meeting with Bailey reflect she told Bailey that "we all cared about [Jendersee] and didn't want to see her 'used' or treated poorly." Pl.'s Ex. 2. Bailey was instructed to limit his personal contact with Jendersee at work. Kassebaum Dep. at 60-61; Bailey Dep. at 200-01. Jendersee states that Kassebaum and Thomas indicated to her that people at Augustine were upset she was dating a non-Caucasian. Jendersee Dep. at 40-41. Bailey contends his contact with Jendersee was required for his job because she was a buyer for the accounting department, however Jendersee admits that part of their interaction at work was for personal rather than business reasons. Id. at 43.

In April 2000, Bailey applied for a posted position of Systems Analyst in the Information Services Department. The position available notice specified requirements of a Bachelor's

---

[3] Bailey is Black and Jendersee is Caucasian.

Degree or equivalent experience and training, and experience with identified computer programming languages for the position, and noted that Augustine is "an Equal Opportunity Employer." Lindeman Aff. Ex. F. Bailey does not assert that he met the required qualifications for the position, but argues that he "could have learned." Bailey Dep. at 204. The position was offered to Glenn A. Toewe ("Toewe"), who has a Bachelor of Science degree and experience in computer programming languages. Id. Ex. G; Anderson Aff. ¶ 8.

After not receiving an interview for the position, Bailey sent an e-mail to Kassebaum stating that he felt Augustine was not an "equal opportunity employer." Lindeman Aff. Ex. H; Bailey Dep. at 203. At Kassebaum's repeated request, Bailey reluctantly met with her to discuss his concerns. Kassebaum Dep. at 78. Bailey's e-mail read as follows:

> I understand that your a busy person... but I just wanted to say that I don't feel that AMI is truly a Equal Opportunity Employer... I'll leave it at that "I have nothing else to say; nor any issues" I just don't feel that everyone is afforded the same opportunity to show their abilities. ;-(

Lindeman Aff. Ex. H. In his deposition, Bailey stated that his e-mail was "a comment and not really a complaint." Bailey Dep. at 205. In response to inquiries by Kassebaum, Bailey indicated that there were not any issues and that there was nothing to talk about. Id. at 223. Kassebaum explained to Bailey that the Information Services Manager, David Anderson, had reviewed his qualifications and that he was not qualified for the Systems Analyst position. Kassebaum Dep. at 81-82. On the same day as this discussion, Bailey made a request for the following day off, which was granted. Mueller Statement at 17.

When Bailey returned to work the following week, Kassebaum became aware Bailey had told other Augustine employees that Kassebaum and Mueller had referred to him as a "shitty

interviewee" and a "charity case." Bailey Dep. at 229-30, 238; Kassebaum Dep. at 89; Mueller Statement at 19. Another meeting was called to discuss these alleged comments. In Bailey's presence, Kassebaum and Mueller denied that these statements were made. Kassebaum Dep. at 89; Mueller Statement 19-20. Bailey was warned if he continued to make such statements to other employees he would be subject to discipline. Bailey Dep. at 239; Mueller Statement at 20. Mueller stated that at the meeting they talked about doing whatever was necessary "to put this behind us and to just move forward and to try to maintain a positive attitude in the workplace." Mueller Statement at 20. Bailey asserts that he interpreted this as a threat, meaning he was supposed to stop complaining about alleged discrimination and "commit" to his work, or be fired. Bailey Dep. at 238-39. After this meeting Bailey requested and was granted another day off; he stated he intended to look for a new job. Bailey Dep. at 239; Mueller Statement 20, 22.

Upon returning to work, Bailey was verbally reprimanded on several occasions. Mueller Statement 23, 25, 27-29, 32, 34-35. In May 2000, Kassebaum requested purchasing reports from Bailey as part of his job duties for the Accounts Payable Department. Id. at 22-23. Bailey delegated this responsibility to another employee without telling Kassebaum. Bailey Dep. at 241. After complaining to Bailey's supervisor, Mueller, Kassebaum ultimately received the report from another employee. Lindeman Aff. Ex. I. In or around June or July, 2000, Mueller received a complaint from another of Bailey's co-workers that Bailey was disturbing his work. Mueller Statement at 24-25. Bailey's personal contact with Jendersee during work hours is also alleged to have continued. On at least one occasion Bailey called Jendersee at her work station and asked her to get him a "pop" and bring it to his work station. Jendersee Dep. at 96-97; Bailey Dep. 196-97, 263-64; Kassebaum Dep. 12, 56, 58-60. On other occasions Bailey was

reprimanded for playing ping-pong with Jendersee during the work day. Bailey Dep. at 252; Kassebaum Dep. 112-13; Mueller Statement 25.

On August 15, 2000, Jendersee initiated a meeting with herself, Bailey, Kassebaum, Mueller and Thomas. Jendersee Dep. at 49-50. At this meeting the participants discussed the reprimands directed to Bailey regarding his work and the requests that Bailey and Jendersee limit their personal contact at work. Bailey Dep. at 250, 252, 262. Kassebaum expressed a concern about Jendersee, a human resources employee, who deals with a lot of confidential information, having an intimate relationship with someone else at the company. Kassebaum Dep. at 69; Jendersee Dep. at 39-41. Jendersee asserts that Kassebaum meant for her to understand that the problem was people being unhappy with a White woman dating a Black man. Jendersee Dep. at 41. Bailey asserts he complained of unfair treatment and discrimination at this meeting. The meeting concluded with Thomas suggesting that everyone commit to moving forward and focusing on their job duties. Kassebaum Dep. at 124-25; Jendersee Dep. at 53-54.

Subsequently, a new supervisory position became available within the Accounts Payable Department. Mueller Statement at 29. Bailey was upset about not being recommended for this position, and met with Mueller to discuss it. Mueller Statement at 31-32. Mueller asserts that Bailey's behavior became more problematic after he was told that Osman Mosani, a Black person, would be recommended for the promotion. Id. Bailey began to wear headphones while walking around the Augustine office, he acted withdrawn and uncommunicative, he no longer greeted Thomas in the hallways, and he placed a streamer across his cubicle with a "do not disturb" sign on his work station. Id. at 32-33; Thomas Dep. at 54-55; Bailey Dep. at 245.

On August 17, 2000, Bailey sent an e-mail to Mueller requesting his paycheck that read:

Dan,

I be wanting to get me check today being dat I wont be hear tomorrow.... will you instructed Jeanne to give me me check/

Tanks,
George Bailey

Lindeman Aff. Ex. J. Mueller was disturbed by this e-mail and recommended Bailey's termination. Mueller Statement at 34-35; Kassebaum Dep. at 131, 134. Later that day, Thomas and Randy Benham ("Benham"), Augustine's general counsel, met with Bailey to discuss his behavior, and Bailey was reprimanded for sending the e-mail to Mueller. Thomas Dep. at 87-88, 95-96. Thomas asked Bailey to decide whether or not he wanted to continue working for Augustine, and if so to move forward and focus on his work. Bailey Dep. at 131; Thomas Dep. at 102-04. Bailey alleges that Thomas stated to him that "niggers should just shut up and do their job." Bailey Dep. at 131. Thomas vehemently denies making this comment, and Benham's notes from the August 17, 2000, meeting do not reflect the comment being made. Thomas Dep. at 104; Benham Aff. ¶ 3; Lindeman Aff. Ex. K. This inflammatory remark was not mentioned in Bailey's original complaint to the Equal Employment Opportunity Commission, in his psychiatrist's notes related to his contemporaneous medical treatment, in his subsequent written correspondence to Augustine, or in his original pro se Complaint or Amended Complaint. Lindeman Aff. Exs. M, N, O; Compl.; Am. Compl. This allegation first appeared in the unfiled Second Amended Complaint. Second Am. Compl.

Bailey alleges he said at the August 17, 2000, meeting that he was suffering from anxiety and needed to take some time off. The meeting ended with Bailey and Thomas agreeing to talk the following Monday, August 21, 2000. Lindeman Aff. Ex. K. Shortly after the meeting ended,

Bailey returned and explained he was "going to begin looking for another job on Monday," but that he was not yet resigning. Id. Thomas told Bailey to think about it over the weekend and they would talk Monday. Id. Bailey alleges that he contacted Mueller on Friday, August 18, 2000, to report he was going to the doctor the following week and would not be at work on Monday. Lindeman Aff. Ex. L; Bailey Dep. at 265. Augustine asserts Bailey was supposed to contact Mueller on Monday, August 21, 2000, to provide an update. Mueller Statement at 35. However, Bailey did not contact Mueller or report for work on August 21. Id. at 35-36. On Tuesday, August 22, Bailey telephoned Mueller to ask for the rest of the week off, stating that his psychiatrist told him to take the rest of the week off due to stress. Bailey Dep. at 265-66; Mueller Statement at 36; Kassebaum Dep. at 135-36. Bailey's request was granted and Augustine asserts Bailey was to report for work on August 28, 2000. On August 21, 2000, Thomas also became aware that other employees were feeling frightened and intimidated by Bailey. Thomas Dep. at 106; Lindeman Aff. Ex. L.

On August 25, 2000, Bailey visited his psychiatrist, Dr. Timothy J. Twito, M.D. Lindeman Aff. Ex. N. Bailey asserts that Dr. Twito told him to avoid working until September 5, 2000, and that the Doctor was supposed to fax a note to the Augustine Human Resources Department requesting additional time off. Bailey Dep. at 268. Jendersee testified that she received this note by fax at some time and put it in Kassebaum's mailbox. Jendersee Dep. at 60. Kassebaum denies that she ever received a Doctor's note relating to Bailey. Kassebaum Dep. at 143. A purported copy of the Doctor's note stating Bailey would return to work on September 5, 2000, was produced by Bailey, however the note is undated. Lindeman Aff. Ex. T. The note contained in Bailey's medical records at Dr. Twito's office is dated September 1, 2000. Id. Ex.

V. Bailey's file does not contain any correspondence from Dr. Twito directly with Augustine. Id. Ex. U at 4.

Benham, Thomas and Kassebaum expected Bailey to be at work on Monday, August 28, 2000, to attend a 5:00 p.m. meeting that day. Kassebaum Dep. at 126. Bailey did not show up at work that day. Id. at 12. Augustine terminated Bailey's employment on August 28, 2000, characterizing Bailey's failure to appear at work as a resignation. Lindeman Aff. Exs. O, R; Bailey Dep. at 269. Later, in response to an inquiry by Bailey, Augustine detailed that Bailey's "behavior [had] not been consistent with Augustine['s] values," and that Bailey had, among other things, been insubordinate and disrespectful to his co-workers. Lindeman Aff. Ex. S.

## III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome

determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**A. Race Discrimination**

Title VII of the Civil Rights Act of 1991 makes it an unlawful employment practice for an employer to "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2002).

When a plaintiff puts forth direct evidence that an illegal criterion, such as race, was used in the employer's decision to terminate the plaintiff, the court applies the standards enunciated in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), as modified by § 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m). Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Under this modified Price Waterhouse standard, a defendant is liable for discrimination upon proof by direct evidence that an employer acted on the basis of a discriminatory motive, and proof that the employer would have made the same decision absent the discriminatory motive is only relevant to determining the appropriate remedy.

Where a plaintiff relies on circumstantial, as opposed to direct, evidence of intentional discrimination, the Court applies the three-stage burden shifting approach developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined by the Court in Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Dammen v. UniMed Med. Ctr., 236 F.3d 978, 980 (8th Cir. 2001). Under this framework, the plaintiff bears the initial burden of presenting a prima facie case of discrimination. Dammen, 236 F.3d at 980. If the prima facie case is

established, a legal presumption arises that the employer unlawfully discriminated against the plaintiff. Id. This rebuttable presumption shifts the burden[4] to the employer to produce evidence that the plaintiff was rejected (or someone else was preferred) for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the McDonnell Douglas framework becomes irrelevant. The sole remaining issue is whether or not the employer discriminated. Id. The plaintiff then has an opportunity to prove, by preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. However, proof that a defendant's proffered reason is unpersuasive or contrived does not establish plaintiff's proffered reason of discrimination is correct. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000). That is, it is not enough to *disbelieve* the employer, but rather the plaintiff's explanation of intentional discrimination must be *believed*. Id. at 147.

**1. Discriminatory Termination**

Bailey alleges several comments made by Augustine employees as direct evidence of race discrimination. The most striking comment is obviously Bailey's allegation that on August 17, 2000, Thomas stated to Bailey, in the presence of Randy Benham, that "niggers should just shut up and do their job." Bailey Dep. at 131. This repulsive remark first emerged in this litigation in the unfiled Second Amended Complaint after Bailey's retention of counsel. Bailey also alleges he was told by Mueller and Thomas to limit his contact at work with Jendersee (which he felt was because of their racial differences), told by Kassebaum that he was a "shitty interviewee"

---

[4] This framework only shifts the burden of production; the burden of persuasion rests at all times with the plaintiff. Id.

and a "charity case," and later told by Mueller to put everything behind him and "commit." Bailey Dep. at 229-30, 238-39. Bailey claims that these statements support the conclusion that Augustine acted on the basis of a discriminatory motive when it terminated his employment.

Except for the alleged "nigger" comment, these statements are insufficient direct evidence to show a discriminatory motive. Each is too vague and subject to varying interpretations to reliably support the inference of race discrimination. Fundamentally, the availability of summary judgment turns on whether or not a proper jury question is presented. Anderson, 477 U.S. at 249. The crux of the analysis is that the non-moving party must show a "genuine" issue of material fact to defeat summary judgment. Matsushita, 475 U.S. at 587; Anderson, 477 U.S. at 252; Celotex, 477 U.S. at 323. While the making of the alleged comment is a fact issue, it is not a genuine material dispute sufficient to prevent summary judgment.

The parties are in direct conflict over whether or not the alleged "nigger" statement was made to Bailey. Thomas arduously denies the comment was ever made, Benham's detailed written notes taken during the meeting include no reference to the alleged comment, or any remotely similar remark. Reference to this alleged highly inflammatory remark by Bailey is conspicuously absent in any documentation related to this case prior to the Second Amended Complaint. There were three individuals present during the meeting at which Bailey alleges the comment was made: Thomas, Benham, and Bailey himself. Benham is Augustine's lawyer, and Thomas was obviously aware that Benham was in the room and participating in the conversation. The meeting was in the context of considering Bailey's possible termination, which had been recommended to Thomas by Mueller. The circumstances and gravity of the meeting belie Bailey's allegation that Thomas lost his composure and uttered such a blatantly inflammatory

racial slur, in the immediate presence of his company's attorney and in the context of informing Bailey of his potential termination. No evidence suggests that the meeting was a heated exchange, or that any name-calling took place. By all accounts, the meeting ended with Thomas asking Bailey to think things over and they would talk again the following Monday. The tenor of the meeting was one of appropriate seriousness at which it is extremely doubtful that Thomas would engage in racially derogatory name calling.

After Bailey's termination, he wrote a lengthy letter to Augustine expressing his point of view of the events that had transpired during his tenure as an Augustine employee. Lindeman Aff. Ex. O. Bailey's letter was highly detailed, referenced numerous meetings on specific dates, and he quoted directly several remarks made to him by Augustine supervisors. This letter was written on September 1, 2000, a short time after his meeting with Thomas and Benham. Bailey's letter includes absolutely no reference to the alleged inflammatory comment. The genuineness of Bailey's allegation is further belied by the fact that the E.E.O.C. complaint filed by Bailey provided space for Bailey to explain the basis of his claim of race discrimination. Id. Ex. M. In the section titled "THE PARTICULARS ARE," Bailey wrote a brief description detailing his opinion that he had been discriminated against, but again included no reference to the alleged remark. Moreover, Bailey's original Complaint before this Court contained no reference whatsoever to the now-alleged comment, nor did his Amended Complaint. It was only after Bailey retained counsel and served the Second Amended Complaint on Augustine that the comment was asserted by Bailey. The desperate 11th-hour attempt to avoid summary judgment by throwing in an allegation that Bailey's immediate supervisor told Bailey that "niggers should just shut up and do their job" is not sufficient to defeat summary judgment.

Bailey cannot rely on mere allegations or denials to defeat summary judgment, "but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik, 47 F.3d at 957. This fact dispute is not genuine. This last-ditch allegation of a supervisor speaking perhaps the most pejorative word in the discrimination context does not create a genuine issue of material fact. This Court is aware of no authority supporting the proposition that a single, uncorroborated utterance of the word "nigger" by an employee's supervisor is sufficient to avoid summary judgment, and can not here endorse such a trip-trigger bright line standard. Defendant's Motion for Summary Judgment is granted.

**2. Deprivation of Equal Employment Opportunities**

Bailey's Second Amended Complaint alleges that he was deprived of equal employment opportunities by the actions of Augustine. Specifically, Bailey argues that he was denied a promotion opportunity at work based on race, and that Augustine's tuition reimbursement policy was not properly applied to him because of his race. Pl.'s Mem. in Opp. at 22.

**a. Failure to Promote**

Bailey alleges that Augustine's failure to promote him to a higher position was an instance of race discrimination. Bailey offers no direct evidence for this allegation, therefore it is analyzed under the McDonnell Douglas test. To establish a prima facie case of racial discrimination, a plaintiff must show: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) some evidence that would allow the inference of improper motivation. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259-260 (8th Cir. 1996). Bailey fails to meet this burden.

The posted minimum requirements for the Systems Analyst position required a four year degree or fluency in several computer languages. Bailey admits that he did not have the requisite qualifications for the position, but his attorney asserted at oral argument that he was "enrolled" in an I.T. program and was "finishing" relevant coursework. While Bailey potentially may have become qualified for the position at a future point in time, the fact remains that he was not so qualified at the time the position was offered to Toewe, and that Toewe met the posted job requirements. Toewe was an internal candidate who had worked in the Augustine Information Services Department for several years, has a Bachelor of Science degree in computer science, and had been performing well. Bailey fails to establish a prima facie case of race discrimination on the basis of a failure to promote. Even were Bailey to establish a prima facie case, Augustine proffers a legitimate non-discriminatory reason for promoting Toewe, namely his superior qualifications. Bailey identifies no evidence indicating this reason is merely a pretext for race discrimination. Bailey's claim of deprivation of equal employment opportunities by failure to promote in Counts I and II is dismissed.

**b. Tuition Reimbursement**

Bailey alleges that a $935.14 portion of his tuition reimbursement initially applied to year 1999 and later reallocated by Augustine to year 2000 was improper. Bailey Dep. at 181. Augustine employees are eligible for reimbursement of up to $5,250 of education spending per year. Kassebaum Dep. at 52-53. Reimbursements are applied in the year the coursework is completed. Id. at 54-55. Bailey's relevant $935.14 of coursework was completed in 2000. Bailey Dep. at 178-79. Bailey asserts that the amount was applied to 1999 and that while Augustine was aware of it, Kassebaum told him "don't worry about it," but then later reallocated

the amount to 2000. Id. at 183. However, this reallocation did not affect the level of benefits received by Bailey. Bailey's requests for reimbursements never exceeded the $5,250 amount in either year, Bailey continued to receive tuition reimbursements for the year 2000, and Bailey has identified no additional reimbursements that were requested and denied. Bailey Dep. at 182, 201-02. The shifting of allocation from 1999 to 2000 simply had no adverse impact on Bailey, and thus cannot constitute a discriminatory deprivation of equal employment opportunities. Summary judgment on this portion of Bailey's claims in Counts I and II is granted.

**3. Hostile Work Environment**

Bailey's claim of hostile work environment is analyzed under the McDonnell Douglas test. To prevail, Bailey must show (1) he is a member of a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based upon race, (4) the harassment affected a term, condition or privilege of employment, and (5) the employer knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment. Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001). Evidence of a hostile work environment is based on the totality of the circumstances of the work environment. Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 355 (8th Cir. 1997). Factors indicating a hostile work environment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1994). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" a hostile work

environment exists. Id. at 21 (internal citations omitted). The harassment must be sufficient to create an objectively hostile environment. Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). In some circumstances, use of the word "nigger" directed at an employee by a supervisor has been held sufficient to create a hostile work environment. See Delph, 130 F.3d at 356 (internal citations omitted). Generally, however, a plaintiff must allege more than isolated instances. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997). A single offensive utterance does not create an actionable hostile work environment. Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997).

Bailey argues that the alleged "nigger" comment made by Thomas, in the context of a meeting discussing Bailey's complaints and employment future, combined with the prior environment where he alleges he was told not to interact with Jendersee because she was White, constitute a hostile work environment. Augustine asserts that, even if made, the alleged "nigger" comment was an isolated incident after which Bailey never reported to work again, therefore he was not subjected to an objectively hostile work environment subsequently.

A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment. See Palesch, 233 F.3d at 567; Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000). When asked "exactly" what Mueller told him about his interaction with Jendersee, Bailey testified that Mueller said: "George, I'm concerned about you and Mindy [Jendersee] seeing each other too much in the workplace. People are concerned about it. People are not liking seeing you guys together. So could you please limit that." Bailey Dep. at 199-200. Bailey stated that he believed this to be a racially motivated comment because of the "tone" Mueller used. Id. at 201. This evidence is insufficient to support a claim of hostile

work environment.

Taking the facts in the light most favorable to Bailey, the totality of the alleged circumstances of Bailey's employment conditions were not so permeated with intimidation, ridicule and insult as to pervasively alter his workplace conditions to create an abusive and hostile work environment. Summary judgment is granted on Bailey's hostile work environment components of Counts I and II.

**4. Retaliation**

Under Title VII and the MHRA, it is an unfair employment practice to discriminate against an employee because he has opposed any practice made unlawful by applicable statutes. 42 U.S.C. § 2000e-3; Minn. Stat. § 363.03 Subd. 7. Both statutes are comparable in effect and therefore analyzed under Title VII case law. Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997); Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986). Bailey's claims are analyzed under the McDonnell Douglas standard. To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir. 2001). The defendant may then rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action. Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997). If the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal retaliation. Id. "The requisite causal connection may be proved circumstantially by proof that the discharge followed the

protected activity so closely in time as to justify an inference of retaliatory motive." Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992).

In order to qualify as a protected activity, Bailey must have complained about the alleged race-based discrimination. Minn. Stat. § 363.03 Subd. 7; Bradley v. Widnall, 232 F.3d at 632. Bailey admits that his e-mail to Kassebaum in April 2000 was not a complaint of discriminatory conduct. Bailey Dep. at 205. However, Bailey asserts he complained about his treatment at the August 15, 2000 meeting. Presuming that a valid communication of a complaint occurred, Bailey fails to establish the second and third prongs of the Sowell test.

"An adverse employment action is exhibited by a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities." Bradley, 232 F.3d at 632 (emphasis in original). Bailey has identified no adverse change in his salary, work benefits, or job duties, that would be sufficient to constitute a material disadvantage. Bailey essentially alleges that the office atmosphere was unpleasant, but there is no indication that such a condition was predicated on his alleged complaint at the August 15, 2000 meeting. Bailey being asked to limit his conduct with Jendersee, being asked not to wear headphones or play ping-pong, the reallocation of his tuition benefits, and the failure to promote Bailey to the Systems Analyst position, all occurred prior to the August meeting, and even prior to his April e-mail. Where the opposed employment practice had been occurring prior to the plaintiff's complaint, an inference of causal connection that the conduct was motivated by the complaint is unwarranted. See, e.g., Smith v. Ashland, Inc., 250 F.3d 1167, 1173-74 (8th Cir. 2001). Summary judgment on Bailey's claims of retaliation in Counts I and II is granted.

**B. Family Medical Leave Act Claim**

To establish a prima facie case for FMLA retaliation, the employee must demonstrate that "the leave was the determinative factor in the employment decision at issue." Hatchett v. Philander Smith Coll., 251 F.3d 670, 677 (8th Cir. 2001). Bailey alleges that he was retaliated against by not being restored to his position when he returned from his leave of absence between August 17 and September 5, 2000. Augustine asserts Bailey did not make an FMLA leave request for medical leave. Bailey requested the time off work due to stress. Stress does not rise to the level of a serious health condition. Cf. Collins v. NTN-Bower Corp., 272 F.3d 1006, 1008 (stating that "'[s]ick' does not imply 'a serious health condition'"). To make a valid request for medical leave, an employee must identify a "serious medical condition" necessitating the leave. Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir. 2002). Bailey alleges that on August 18 and 25, 2000, he told his supervisors that he was going to see a psychiatrist and wanted to take some time off work. An employee must do more than simply provide a notice that he had seen a doctor to constitute a request for FMLA leave. Collins, 272 F.3d at 1008. Moreover, even supposing it would be sufficient notice, the note from Bailey's doctor bears a September 1, 2000 date, which is five days subsequent to Bailey's termination. Bailey has also failed to identify any requested leave time that was not granted by Augustine. Because Bailey did not notify Augustine of any serious health condition requiring leave, Count III, a claim under the FMLA, must be dismissed.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

A. Defendant's Motion for Summary Judgment [Docket No. 47] is **GRANTED** as to Bailey's claims of discriminatory termination, hostile work environment, retaliation, and deprivation of equal employment opportunities through failure to promote and improper tuition reimbursement allocation in Counts I and II of the Second Amended Complaint, and

B. Defendant's Motion for Summary Judgment [Docket No. 47] is **GRANTED** as to Bailey's claim of violations of the FMLA in Count III of the Second Amended Complaint.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: February 7, 2003

# UNITED STATES DISTRICT COURT
## District of Minnesota

700 Federal Building
316 North Robert Street
St. Paul, MN 55101

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

417 Federal Building
515 West First Street
Duluth, MN 55802

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.